UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

C'QUAN MICHAEL HINTON, individually,
GINA EDWARDS, as Personal Representative
of the Estate of JOSHUN EDWARDS, and
DARTANION EDWARDS, individually;

       Plaintiffs,

                                           No.

-v-                                       Hon.

LEE ANN GASPAR, in her individual
capacity; CITY OF FLINT, a Municipal
corporation; jointly and severally,

       Defendants.
_____

## COMPLAINT AND JURY DEMAND

      NOW COME the Plaintiffs, C'QUAN MICHAEL HINTON ("Mr. Hinton"),

individually, GINA EDWARDS ("Ms. Edwards"), Personal Representative of the

Estate of JOSHUN EDWARDS ("Mr. Joshun Edwards"), and DARTANION

EDWARDS ("Mr. Dartanion Edwards"), individually, by and through their

attorneys, Mueller Law Firm, by Wolfgang Mueller and John Wm. Martin, Jr., and

Katten Muchin Rosenman LLP, by Charles A. DeVore and Loren M. Lee, co-

counsel for Mr. Hinton, and file their Complaint against the Defendants, LEE ANN

GASPAR ("Gaspar"), in her individual capacity, and the CITY OF FLINT

("Flint"), a municipal corporation, in this civil action, stating unto this Court as

follows:

1.      This is an action for damages brought pursuant to 42 U.S.C. §§ 1983

and 1988, the Fourth and Fourteenth Amendments to the United States

Constitution against Defendants, Lee Ann Gaspar, in her individual capacity, and

the City of Flint, a municipal corporation.

## JURISDICTION AND VENUE

2.      Jurisdiction is founded upon 28 U.S.C. §1331, 28 U.S.C. §1343, and

pendent jurisdiction of this Court to hear closely related state law claims.

3.      Venue is proper based on the situs of the incident, which occurred in

Flint, Michigan, which is in the Eastern District of Michigan.  28 U.S.C. §1391.

## PARTIES

4.      At all pertinent times Plaintiff, Mr. Joshun Edwards, was a United

States citizen.[1]

5.      At all pertinent times Plaintiff, Mr. Dartanion Edwards, was a United

States citizen.

6.      At all pertinent times Plaintiff, Mr. Hinton, was a United States

_____

[1]  Mr. Joshun Edwards passed away on February 21, 2024.  Ms. Gina Edwards
was appointed and qualified as personal representative of Mr. Joshun Edwards'
estate on May 20, 2024 by State of Michigan Probate Court for the County of
Genesee.

citizen.

7.      At all pertinent times Defendant, Gaspar, was employed as a Sergeant by the Flint Police Department ("FPD"), a department of the Defendant, City of Flint, and was acting within the scope of her employment and under color of law.

8.      Gaspar, as a sworn police officer, had taken an oath, the Law Enforcement Code of Ethics, that stated in pertinent part:  "*As a sworn police officer, my fundamental duty is to serve the community; to safeguard lives and property; to protect the innocent against deception, the weak against oppression or intimidation and the peaceful against violence or disorder; and to respect the constitutional rights of all to liberty, equality and justice.*"

9.      Defendant, City of Flint, at all relevant times, was a municipal corporation organized under the laws of the State of Michigan.  Defendant, City of Flint, operated the FPD and employed its police officers, deputies, and sergeants, including Gaspar.

## FACTUAL ALLEGATIONS

### A.      Background

10.      On October 9, 2007, shortly after 8:00 p.m., Robert Person III was shot to death near the intersection of Lippincott Boulevard and South Averill Avenue in the Flint suburb of Burton, Michigan.

11.      Gaspar was the Sergeant assigned to lead the homicide investigation

3

on the same day.

12.     Four men, including the three Plaintiffs and Kino Christian ("Christian"), were subsequently arrested and charged with the murder.

13.     On February 17, 2009, all four men were found guilty of premeditated murder and other charges in connection with the killing.

14.     All four men were sentenced to mandatory life in prison.

15.     Because Plaintiff, Mr. Hinton, was a minor at the time of the murder, he was resentenced in 2015, pursuant to *Miller v. Alabama*, 567 U.S. 460; 132 S. Ct. 2455; 183 L. Ed. 2d 407 (2012), to a term of 32 to 60 years' imprisonment.

16.     The prosecution's star witness was 15-year-old Jarylle Murphy ("Murphy").  Murphy had several interviews with the FPD, each of which was conducted by Gaspar and later transcribed.

17.     Plaintiffs' trial counsel never received the transcript of Murphy's first interview with Gaspar, which contained material facts that contradicted known evidence and Murphy's later statements and eventual testimony.

18.     Instead, trial counsel received a materially false and misleading summary of Murphy's first interview, which was prepared by Gaspar.

19.     On June 17, 2021, Murphy recanted the entirety of his testimony in a sworn affidavit.  Murphy admits he "*had never met and did not know Robert Person.*"

4

20.     Murphy did not witness the shooting of Robert Person and was never at the scene of the homicide.  Murphy heard about the shooting on the evening news and used it as a cover for being out past his curfew.

21.     On July 27, 2022, the Michigan Supreme Court vacated Plaintiffs' convictions, finding that the state's suppression of the transcript of Murphy's first interview with Gaspar constituted a *Brady* violation.

22.     In its opinion, the Michigan Supreme Court questioned the "*thoroughness and good faith of this [homicide] investigation*."

**B.     Homicide Investigation by the Flint Police Department**

23.     On the night of October 9, 2007, FPD responded to reports of a shooting near the intersection of Lippincott and Averill shortly after 8:00 p.m. FPD officers were quickly dispatched; Gaspar arrived on scene around 10:30 p.m.

24.     Physical evidence was collected from the scene, including a bicycle, a cell phone, a hat, a bracelet, and thirty-five shell casings from three types of bullets.  This evidence was submitted for DNA testing before trial.  The usable partial profiles obtained from this evidence did not match the DNA profiles of any of the four men charged in this case, and Plaintiffs were eliminated as possible donors.

25.     FPD interviewed several witnesses on the night of the homicide, including a security guard of a nearby business and a bystander whose car was

stuck by a stray bullet.  Both the bystander and the security guard said they saw the victim running alone at the time of the shooting.

26.     None of the responding officers saw or spoke to Murphy that night.

27.     The morning after the shooting, Gaspar interviewed Anthony DeJon Williams ("Williams") at Southwestern Middle School.  During this interview, Williams explained that he spent the afternoon prior to the shooting with the victim.  Williams never mentioned Murphy.

28.     Williams was never contacted by Gaspar or anyone from FPD after this initial interview.  Further investigation would have revealed that Williams was Person's "*best friend*," a credible witness who regularly spent time with the victim.  Gaspar deliberately chose not to investigate the facts provided by Williams.

29.     Murphy first appeared at the FPD station on October 16, 2007, a full week later, claiming he had witnessed the shooting and carrying a piece of paper with descriptions of four suspects containing specific details at a level that defied credibility.  During this first interview, Murphy claimed he met the victim for the first time that day.

30.     Gaspar recorded part of her October 16 interview with Murphy.  She later wrote an incomplete and materially false summary of the interview, which

was turned over to the prosecutor as part of the discovery package.[2]  She did not

disclose to the prosecutor that the interview had been recorded or that a transcript

had been created.

31.     The transcript of the October 16, 2007 interview (the "Suppressed

Transcript") inexplicably begins midway through Murphy's statement.  According

to Gaspar herself, this was not the standard practice.

32.     The Suppressed Transcript revealed that Murphy claimed that he

couldn't see the suspect's faces clearly because it was "*kinda dark*," and he would

not be able to identify two of the suspects if he saw their faces again.  None of

these facts were included in Gaspar's summary.

33.     This is also in sharp contrast with the written descriptions Murphy

brought to the police, where he "recounted" precise details down to the suspects'

eye colors, facial hair, ear piercings, and the brands and colorways of each

suspects' jeans and shoes.  Gaspar never questioned this discrepancy.

34.     The Suppressed Transcript differed from Murphy's subsequent

interview statements and testimony in several material respects, including the fact

that Murphy's own description of the events made it clear that he could not have

---

[2]  In *People v. Christian*, 510 Mich. 52, 62; 987 N.W. 2d 29 (2022), the Michigan
Supreme Court would later state, "that summary was incomplete in some places
and false in others."

been at the scene of the murder until 60 to 90 minutes after it occurred.

35.     Gaspar interviewed Murphy a second time on November 8, 2007, at the office of assistant prosecuting attorney Karen Hanson.  Again, the interview was recorded.  A transcript of the second interview was prepared and disclosed to the prosecutor and defense attorneys as part of the homicide case file.

36.     During this second interview, Murphy admitted that he "*can't remember from that far back*," and he "*couldn't see [the shooters] really good*" because "*all [he] did was turn around and take a glance*."  Gaspar did not attempt to corroborate any details or discrepancies in Murphy's story and continued with her investigation as if Murphy was a credible witness.

37.     Gaspar told 15-year-old Murphy that if he was "*not a witness for the prosecution, then [he] had to be a suspect*."  In an effort to protect himself, Murphy would add to his story whenever Gaspar fed him additional information. This explains why Murphy's "memory" became more consistent with other witness's statements and the physical evidence as trial approached.

38.     Any reasonable officer would know that minors are particularly susceptible to external influence, especially from authority figures such as police officers.

## C.    Murphy's Identification of the Suspects

39.     Following the October 16, 2007 interview, Gaspar had Murphy view a

photo array containing Mr. Hinton, who was intentionally placed in the number two (top middle) position.

40.     Similarly, following the November 8, 2007 interview, Gaspar had Murphy view three sequential photo arrays, this time showing Murphy arrays containing Mr. Joshun Edwards, Mr. Dartanion Edwards, and Christian.

41.     Like the photo array containing Mr. Hinton, each of the Plaintiffs was intentionally placed in the number two (top middle) position.

42.     Gaspar would later testify to the jury that she had learned that "*people lean toward the outer at picking people, so in all fairness to any suspect I've dealt with, I try to put them in the middle.*"

43.     Contrary to Gaspar's testimony, people viewing multiple items, like photo arrays, tend to be "edge averse" and will select from the middle or near eye level.

44.     By placing all three Plaintiffs in the number two (top middle) position, Gaspar intentionally skewed the photo identification process to facilitate Murphy's identification of Plaintiffs as the suspects.

45.     Gaspar further skewed the process by telling Murphy that the suspects were in the photo array, and to be careful with his picks because there were undercover officers included as fillers in the lineups.

46.     Gaspar also let out an audible "*sigh*" when Murphy initially chose

someone who was not one of her desired suspects, and asked, "*Are you sure?*" after an incorrect pick.

47.     These cues were unduly suggestive and improperly influenced Murphy to select the suspects in the No. 2 position in the photo arrays.

48.     Gaspar never showed Murphy a photo array or in-person lineup containing other known suspects.

49.     Murphy "*made up*" the descriptions of the shooters.  This would have been evident to any reasonable officer.  For example, Murphy claimed he saw suspect #2 twice on October 9, 2007, first during a confrontation in daylight and again at the time of the shooting.  Murphy described suspect #2 as "light or brown skinned," with "light brown eyes."  Murphy identified suspect #2 as Mr. Hinton who has dark brown (nearly black) eyes and a deeper complexion, nearly the opposite of Murphy's description.

50.     Murphy's identification of Plaintiffs in the photo arrays were used as probable cause for their arrests, which were recommended by APA Karen Hanson.

51.     Based on Murphy's interviews, Gaspar knew that there were so many inconsistencies in Murphy's statements and with evidence known to her that no reasonable officer would have believed that Murphy was actually an eyewitness to the crime as he described.

**D.     The Finding of Probable Cause**

52.     Despite her knowledge that Murphy's identification of Plaintiffs was unreliable, on November 9, 2007, Gaspar submitted a warrant request to the prosecutor's office.  Based on Gaspar's false statements and omissions of material facts concerning Murphy's October 16, 2007 interview and the unduly suggestive and unnecessary eyewitness identification procedure, the prosecutor recommended that arrest warrants be sought for the Plaintiffs and Christian.

53.     On or about November 9, 2007, Gaspar swore out facts in support of probable cause before a district judge.  The court record and application for warrant included the materially false and misleading summary of Murphy's first interview, did not include the Suppressed Transcript, and omitted material facts about the suggestive suspect identification that the judge would have needed to know to determine whether probable cause existed.

54.     Because of Gaspar's fabricated evidence, false statements, and omissions, the judge found that probable cause existed and issued warrants for Plaintiffs' arrests.

**E.     The 2009 Trial against Plaintiffs**

55.     Before trial, Gaspar did not tell the new Officer-in-charge ("OIC") on

11

the case[3], Sergeant Michael Angus ("Angus"), or prosecutor Karen Hanson, that

there were numerous inconsistencies between Murphy's October 16 interview and

later statements and testimony that would impeach Murphy's credibility in front of

the jury. She also did not disclose the existence of the October 16, 2007 transcript.

And she did not tell Angus of the unduly suggestive witness identification

procedure used with Murphy.

56.     Murphy later testified at both the preliminary exam and trial. His

testimony was critical because he was an "eyewitness" to the murder and the only

witness to identify the Plaintiffs as being the shooters.

57.     At trial, without the evidence contained in the Suppressed Transcript,

Plaintiffs' defense attorneys were unable to exploit the inconsistencies in Murphy's

testimony that would have created reasonable doubt in the minds of the jurors as to

whether Murphy was present at the scene of the shooting or whether he could

properly identify the suspects.

58.     Primarily based on Murphy's testimony, a Genesee County jury

convicted all four men in connection with Robert Person's murder.

59.     Plaintiffs were sentenced to mandatory life in prison on March 17,

---

[3] Gaspar retired shortly before the trial in the criminal case. Angus inherited the case a few weeks before trial and was the OIC at the time of trial.

2009.

## GASPAR'S *BRADY* VIOLATION

60.     In 2014, a member of the Edwards family filed a Freedom of

Information Act ("FOIA") request and discovered that the Suppressed Transcript

had been prepared but never turned over to the prosecutor or defense attorneys.

Motions for relief from judgment were later filed on behalf of several of the

convicted Defendants, alleging that the *Brady* violation by the prosecution robbed

the Defendants of due process and warranted a new trial.

61.     The trial judge denied the Defendants' motions.  The lower court

decision was affirmed by the Court of Appeals.  *See People v. Christian*, Case Nos.

08-022016-FC, 08-022018-FC, 08-02217-FC, 2020 WL 6236251 (Mich. App. Oct.

22, 2020).

62.     On July 27, 2022, the Michigan Supreme Court reversed the Court of

Appeals, holding that the non-disclosure of the Suppressed Transcript was a *Brady*

violation, and that Plaintiffs were entitled to a new trial.  *People v. Christian*, 987

N.W.2d 29, 48 (Mich. 2022).

63.     The *Christian* court highlighted eight different points where Murphy's

October 16 interview differed from his later statement and/or testimony, which are

hereby incorporated by reference.  *Id*. at 43–45.  The Court noted that, "*Murphy's

testimony was central to the prosecution's case, and the suppressed transcript*

13

*would have significantly undermined it.*"  *Id.* at 45.

64.    Having been remanded back to the Genesee County Circuit Court for re-trial, the Genesee County Prosecutor moved to dismiss charges.

65.    On December 22, 2022, criminal charges against Plaintiffs were dismissed.

66.    Each Plaintiff was deprived of his liberty as a direct result of Gaspar's and the City of Flint's actions for **5,523 days or 15 years, 1 month, and 14 days**, from the date of the arrest warrant until criminal charges were dismissed, totaling **16,569 days or 45 years, 4 months, and 24 days** for all three Plaintiffs.

## FLINT'S CUSTOMS AND POLICIES THAT LED TO PLAINTIFFS' WRONGFUL CONVICTIONS

67.    On and before October 9, 2007, the date of the shooting, City of Flint, by and through its final policymakers, had a custom and policy to authorize, condone, tolerate, and approve illegal and unconstitutional actions by FPD officers and command staff.

68.    The City of Flint's illegal and unconstitutional actions and practices included but were not limited to:

      a.    Conducting inadequate investigations into serious felony cases, such as murder, to expeditiously close cases and affirmatively choosing not to develop or pursue actual leads or evidence;

      b.    Knowingly and deliberately fabricating evidence in order to manufacture probable cause to arrest and/or strengthen a case for conviction;

14

c.    Knowingly tolerating *Brady* violations committed by investigators, when it would be apparent to any reasonable officer that the Defendant would be entitled to such evidence;

d.    Knowingly making false statements and/or material omission of facts in reports and testimony before prosecutors and judges in order to obtain probable cause for arrest and continued prosecution;

e.    Failing to have policies and procedures in place, and/or failing to supervise or train employees as to policies and procedures, and/or by failing to attend to such policies and procedures to ensure that *Brady* material is provided to prosecutors and defense attorneys to prevent wrongful convictions;

f.    Failing to initially and periodically train and require police officers, deputies, sergeants, investigators, and other employees in conducting a reasonable and objective inquiry regarding gathering witness statements and thoroughly investigating statements collected in serious felony cases;

g.    Failing to include in their reports relevant factual information which would tend to contradict witness statements made and/or contradictory witness statements themselves;

h.    Failing to supervise their police officers, deputies, sergeants, investigators, and other employees.

69.    Defendant Flint is legally responsible for implementing what *Brady* requires and monitoring staff compliance.  Defendant Flint is liable for its failure to do so.

70.    Defendant Flint, through its final policymakers, further maintained a custom and policy of failing to adequately train, supervise, and/or discipline officers concerning proper and constitutionally adequate evidence collection,

15

analysis, and disclosure, including the duty not to fabricate evidence and to disclose apparent impeachment evidence, such as the Suppressed Transcript.

71.    Defendant Gaspar attended the police academy in January of 1983. She also attended "*homicide school*" sometime after she began working on homicide cases.  She did not receive any additional formal training when she was promoted to sergeant.

72.    Defendant Gaspar never received training on interviewing or gathering statements from minors.  In 2007, City of Flint had minimal to no protocol in place for interviewing or gathering statements from minors.

73.    Flint's customs and policies, set forth above, demonstrated deliberate indifference to the constitutional rights of its citizens, including Mr. Joshun Edwards, and were the moving force behind the individual Defendant's constitutional violations.

74.    The City of Flint's misconduct committed against Plaintiffs by their sergeant were committed intentionally, maliciously, unlawfully, wantonly and willfully, without probable cause or legal justification.

75.    The misconduct of individual Defendant Gaspar and Defendant Flint, as set forth herein, was a direct and proximate cause of Plaintiffs' injuries and damages, including:

> a.    Suffering a deprivation of liberty by being wrongfully incarcerated and imprisoned for a period of over forty-five

16

cumulative years;

b.      Severe emotional distress for the period from their arrest to the present, including, but not limited to:  the emotional distress of being charged with murder, facing a sentence of life in prison without the possibility of parole; and being wrongfully convicted of crimes the Defendant knew they did not commit;

c.      Physical manifestations of emotional distress including, but not limited to, sleeplessness, irritability, loss of appetite, headaches, anxiety, depression, and other symptoms;

d.      Fright, shock, indignity, humiliation, outrage, and embarrassment of being wrongfully charged and imprisoned for murder;

e.      Sustained periods of forced isolation during the COVID-19 pandemic, and complete inability to protect themselves from contracting the deadly, highly contagious virus because Michigan prisons did not provide adequate protection for inmates such as masks, cleaning products, social distancing, or regular COVID-19 testing;

f.      Loss of enjoyment of daily activities;

g.      Not being able to attend the funerals of several family members and loss of relationships;

h.      Physical injuries suffered in prison;

i.      Inability to pursue romantic relationships and raise a family;

j.      Loss of employment opportunities, past income, and future earning capacity;

k.      Restricted and/or complete loss of all forms of personal freedom and physical liberty, including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, personal fulfillment, sexual activity, family relations, social relations, skill building, recreational activities,

17

hobbies, and personal expression;

l.      Many of Plaintiffs' injuries and damages are likely to be permanent; and

m.     Other damages which may be revealed through discovery.

## COUNT I

## FABRICATION OF EVIDENCE BY GASPAR IN VIOLATION OF FOURTH AND FOURTEENTH AMENDMENTS

76.     Plaintiffs incorporate by reference each preceding paragraph as if fully stated herein.

77.     At all times, Plaintiffs had a constitutional right, secured by the Fourth and Fourteenth Amendments, not to be seized and deprived of liberty because of fabrication of evidence by a government officer acting in an investigative capacity. *See Jackson v. City of Cleveland*, 925 F.3d 793, 816 (6th Cir. 2019) (citing *Halsey v. Pfeiffer*, 750 F.3d 273, 294 n.19 (3d Cir. 2014)) ("[F]abricated evidence that 'is used as the basis for a criminal charge' can form the basis for a §1983 claim because, absent that evidence, there would have been no jury.").

78.     Plaintiffs' constitutional right to be free from arrest and prosecution based upon fabrication of evidence by a police officer acting in a governmental capacity to manufacture probable cause for an arrest was clearly established before October 16, 2007, the earliest date of Defendant's misconduct. *Jackson*, 925 F.3d 793, 825 (6th Cir. 2019) (fabrication of evidence claim clearly established in

1975).

79.     Gaspar deliberately and knowingly fabricated evidence to

manufacture probable cause for an arrest warrant and to later secure Plaintiffs'

convictions.  Gaspar's fabrication of evidence came in the way of falsely reporting

that on October 16, 2007, Murphy had reported the time of the crime as 8:00 p.m.,

to fit the time of the crime, even though she knew his story placed him at the scene

of the crime between 9:00 and 9:30 p.m., 60 to 90 minutes after the crime

occurred.

80.     Gaspar further fabricated evidence by falsely stating that Murphy

claimed in his October 16, 2007 interview that he and the victim walked to the

store on Lippincott when Murphy actually claimed they walked to the bus stop.  In

fact, the Suppressed Transcript shows that Gaspar explicitly asked Murphy

whether they were "*going to the store?*"  Murphy responded, "*No. We were*

*walking to the bus stop*."  Williams told Gaspar that he and the victim went to the

store before the shooting.[4]  The store clerk, Sam Asmaro, testified at trial that the

victim was a regular customer, and he visited the store on the day of the shooting.

81.     Gaspar further fabricated evidence by falsely stating that Murphy

claimed in his October 16, 2007 interview that the shooting occurred because the

_____

[4]  During his trial testimony, Murphy added the store to his narrative.

victim had snitched on the shooters' "brother" when, in fact, Murphy said the shooters claimed the victim snitched on their "moms."

82.     Gaspar further fabricated evidence by way of her unduly suggestive and unnecessary photo array procedure with Murphy as previously described.

83.     Murphy's trial testimony was not impeached by Plaintiffs' defense attorneys because there was no evidence that was inconsistent with Gaspar's reported time of 8:00 p.m.  Murphy's trial testimony placed him at the scene of the crime and clearly affected the jury's decision because it was the only direct evidence of Plaintiffs' involvement in the crime.

84.     Defense attorneys did not have ability to impeach Murphy's trial testimony about "snitching" because they did not have access to the Suppressed Transcript that called such testimony into question. It clearly affected the jury's decision because it provided the jury with a motive that was uncontested.

## COUNT II

### MALICIOUS PROSECUTION BY GASPAR IN VIOLATION OF FOURTH AND FOURTEENTH AMENDMENTS

85.     Plaintiffs incorporate by reference each preceding paragraph as if fully stated herein.

86.     At all times, Plaintiffs had a constitutional right, secured by the Fourth and Fourteenth Amendments, not to be seized and deprived of liberty resulting from fabrication of evidence and knowingly or recklessly made false statements or

material omissions by a police officer to manufacture probable cause.

87.     Gaspar, as the sergeant in charge of the investigation, was under constitutional duties to make truthful statements to the prosecutor and district judge to establish probable cause for the arrest warrants.

88.     Gaspar influenced or participated in the initiation of criminal prosecution and continued detention when she deliberately and knowingly fabricated evidence and made false statements and omissions of facts, deliberately or with reckless disregard of the truth, which were material to a finding of probable cause and Plaintiffs' continued detention.

89.     But for Gaspar's fabrication of evidence, knowingly false statements and material omissions, probable cause would have been lacking; such conduct constitutes a claim of federal "malicious prosecution" under the Fourth Amendment. *Mills v. Barnard*, 869 F.3d 472, 480 (6th Cir. 2017) ("The prototypical case of malicious prosecution involves an official who fabricates evidence that leads to the wrongful arrest or indictment of an innocent person."); s*ee also Franks v. Delaware*, 438 U.S. 154; 98 S. Ct. 267; 457 L. Ed. 2d 667 (1978).

90.     Plaintiffs received a favorable termination of their criminal cases when criminal charges were dismissed on December 22, 2022.

91.     Plaintiffs' constitutional right to be free from illegal seizure and

continued detention without probable cause based upon fabrication of evidence and false statements or material omissions by a government officer acting in an investigative capacity to manufacture probable cause was clearly established before October 16, 2007, the earliest possible date for Gaspar's misconduct. *See Jackson v. City of Cleveland*, 925 F.3d 793 (6th Cir. 2019).

## COUNT III

## *BRADY* VIOLATIONS BY DEFENDANT GASPAR

92.     Plaintiffs incorporate by reference each preceding paragraph as if fully stated herein.

93.     At all times, each Plaintiff had a constitutional right of due process, guaranteed by the Fourteenth Amendment, to be free from police officers not disclosing to the prosecutor material exculpatory and/or impeachment evidence, known as "*Brady*" or "*Giglio*" evidence.

94.     Defendant Gaspar knowingly or inadvertently violated her unwavering legal duty ("*Brady*" duty) to disclose to the prosecutors all material evidence where its exculpatory and impeachment value was apparent, by deliberately withholding the following evidence:

a.      The impeachment evidence contained within the transcript of the October 16, 2007, Murphy interview and discussed at length in the *Christian* Michigan Supreme Court opinion;

b.      The fact that she fabricated the evidence set forth above to make Murphy's trial testimony seem consistent through the

22

entirety of his statements and testimony;

c.   That she deliberately employed unduly suggestive eyewitness identification techniques to fabricate an identification of the three Plaintiffs and Christian as being the shooters in the subject crime; and

d.   Other exculpatory and impeachment evidence that will be uncovered during the discovery process.

95.   Gaspar's deliberate or inadvertent failure to disclose the above-referenced evidence to the prosecutor resulted in material impeachment evidence not being turned over to Plaintiffs' defense counsel, in violation of the State's *Brady* obligations.

96.   Gaspar's *Brady* violations resulted in Plaintiffs not receiving due process and a fair trial, described as "a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). Had Gaspar disclosed the *Brady* evidence, there would have been no arrest, much less a conviction, as evidenced by the prosecutor's voluntary dismissal of the criminal charges when the undisclosed evidence came to light.

97.   Had Defendant Gaspar disclosed the *Brady* material, there would have been no arrest, much less four convictions.

98.   A re-trial that included the *Brady* evidence would result in a directed verdict or acquittal.

99.   The *Brady* evidence cited above would have been apparent to any

23

reasonable officer acting in good faith.

100.   Plaintiffs' right to be provided with material exculpatory and impeachment evidence ("*Brady*" evidence), was clearly established before Plaintiffs' January 2009 trial.  *See Moldowan v. City of Warren*, 578 F.3d. 351, 382 (6th Cir. 2009) ("In fact, at least three circuits recognized prior to August 1990, the earliest possible date for Detective Ingles' involvement in the case, that this right was clearly established.").

101.   The *Brady* violation committed by Gaspar resulted in Plaintiffs not receiving a fair trial, that being a trial resulting in a verdict worthy of confidence.

## COUNT IV

## UNDULY SUGGESTIVE WITNESS IDENTIFICATION PROCEDURES BY DEFENDANT GASPAR

102.   Plaintiffs incorporate by reference each preceding paragraph as if fully stated herein.

103.   At all times, Plaintiffs had constitutional rights of due process, guaranteed by the Fourteenth Amendment, and to a fair trial, guaranteed by the Sixth Amendment, to be free from police officers employing unduly suggestive and unnecessary witness identification procedures to manufacture identification of suspects in a crime.

104.   The illegal witness identification procedure was designed by Gaspar to increase the chance of a false identification to manufacture probable cause for an

24

arrest and prosecution.

105.   Gaspar's witness identification procedure violated Plaintiffs' right to due process and a fair trial and resulted in them not receiving a fair trial.

106.   Plaintiffs' rights to be free from identifications that were unduly suggestive and unnecessary was clearly established long before 2007. *Moore v. Illinois*, 434 U.S. 220, 227; 98 S.Ct. 458; 54 L.Ed.2d 424 (1977) ("Due process protects criminal defendants against the introduction of evidence of, or tainted by, unreliable pretrial identifications obtained through unnecessarily suggestive procedures.").

## COUNT V

## STATE LAW MALICIOUS PROSECUTION
## BY DEFENDANT GASPAR

107.   Plaintiffs incorporate by reference each preceding paragraph as if fully stated herein.

108.   The underlying criminal proceedings against Plaintiffs ultimately terminated in their favor with a dismissal of the charges in state court on December 22, 2022.

109.   The criminal investigation and prosecution were undertaken without probable cause or good faith and with malice.  They were not undertaken with the intention of bringing Plaintiffs to justice for having committed the alleged murder. Instead, Gaspar knowingly fabricated evidence of Murphy's statements to fit the

physical evidence of the crime, utilized illegal photo identification procedures to induce Murphy to select Plaintiffs in photo arrays, and made false statements and omitted material facts that were central to a finding of probable cause.  Gaspar knew that absent the evidence set forth above, there was insufficient evidence against Plaintiffs to support probable cause for arrest or continued detention.

110.   As a direct and proximate result of Gaspar's misconduct, Plaintiffs were charged and convicted of crimes they did not commit, causing them to suffer the special injuries and damages set forth above.

111.   Gaspar's conduct constitutes malicious prosecution pursuant to MCL 600.2907.

## **COUNT VI**

### **CITY OF FLINT'S *MONELL* LIABILITY**
### **BROUGHT BY PLAINITFF MR. JOSHUN EDWARDS**

112.   Mr. Joshun Edwards incorporates by reference each preceding paragraph as if fully stated herein.

113.   Defendant, City of Flint, had a custom and policy to authorize, condone, tolerate, and approve illegal and unconstitutional actions by FPD officers and command staff, which demonstrated "deliberate indifference" to the constitutional rights of its citizens, and was the moving force behind the individual Defendant's violations of Mr. Joshun Edwards's constitutional rights.

114.   Flint's customs and policies resulted in Gaspar knowingly fabricating

26

evidence to manufacture probable cause to arrest and/or strengthen a case for conviction.

115.   Flint's customs and policies resulted in Gaspar knowingly withholding *Brady* evidence that would be apparent to any reasonable officer and should have been turned over to the prosecutor and defendants.

116.   Flint's customs and policies resulted in Gaspar knowingly providing false and misleading information to the prosecutor's office, and omitting material evidence that a prosecutor or district judge would need to know, in order to manufacture probable cause for Mr. Joshun Edwards' arrest and continued detention.

117.   Flint's failure to train and/or supervise its officials or employees caused Gaspar to violate their constitutional rights, Mr. Joshun Edwards was detained without probable cause, charged with crimes he did not commit, wrongfully convicted and imprisoned, and deprived of his liberty, causing him to suffer the injuries and damages set forth herein.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, DARTANION EDWARDS, C'QUAN HINTON, and GINA EDWARDS, Personal Representative of the Estate of JOSHUN EDWARDS, pray for damages for their wrongful detention and imprisonment, in violation of the Constitution, as set forth above, including:

a.    Past and future compensatory damages against Defendant Gaspar in a minimum amount of Fifty Million Dollars (**$50,000,000.00**) for each Plaintiff Mr. Hinton and Mr. Dartanion Edwards;

b.    Past and future compensatory damages against both Defendants in a minimum amount of Fifty Million Dollars (**$50,000,000.00**) for Plaintiff Mr. Joshun Edwards;

c.    Punitive damages as to Defendant Gaspar in a minimum amount of Ten Million Dollars (**$10,000,000.00**) for each Plaintiff;

d.    Reasonable attorney fees and costs pursuant to 42 U.S.C. § 1988;

e.    The costs and disbursements of this action pursuant to 42 U.S.C. § 1920;

f.    All damages allowed under MCL 600.2907 and the common law of the State of Michigan, together with pre-judgment interest, costs and attorney fees allowed under state law; and

g.    Such other and further relief as may be just and proper.


Respectfully submitted,

*s/Wolfgang Mueller*
WOLFGANG MUELLER
Attorney for Plaintiffs
41850 W. Eleven Mile Rd., Ste. 101
Novi, Michigan 48375
(248) 489-9653
wolf@wolfmuellerlaw.com
(P43728)

28

Charles A. DeVore (*pro hac vice* pending)
Loren M. Lee (*pro hac vice* pending)
Co-counsel for Plaintiff C'Quan Hinton
Katten Muchin Rosenman LLP
525 West Monroe Street, Suite 1900
Chicago, IL 60661
(312) 902-5200
charles.devore@katten.com
loren.lee@katten.com

Dated:   June 19, 2024

## <u>JURY DEMAND</u>

Plaintiffs demand a jury trial in the above-captioned matter.


Respectfully submitted,

MUELLER LAW FIRM


*s/Wolfgang Mueller*
WOLFGANG MUELLER
Attorney for Plaintiffs
41850 W. Eleven Mile Rd., Ste. 101
Novi, Michigan 48375
(248) 489-9653
wolf@wolfmuellerlaw.com
(P43728)

Charles A. DeVore (*pro hac vice* pending)
Loren M. Lee (*pro hac vice* pending)
Co-counsel for Plaintiff C'Quan Hinton
Katten Muchin Rosenman LLP
525 West Monroe Street, Suite 1900
Chicago, IL 60661
(312) 902-5200
charles.devore@katten.com
loren.lee@katten.com


Dated:  June 19, 2024